No. 94-018

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

BRAND E. CAEKAERT,

      Petitioner and Appellant,

    v.

STATE COMPENSATION MUTUAL
INSURANCE FUND,

      Respondent/Insurer and Respondent

FRANK WILSON PLUMBING AND HEATING,

      Employer.

**FILED**

NOV 22 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    The Workers' Compensation Court, The
                 Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Patrick G. Frank, Worden, Thane & Haines,
          Missoula, Montana

      For Respondent:

          William J. Mattix, Crowley, Haughey,
          Hanson, Toole & Dietrich, Billings, Montana

                Submitted on Briefs:  September 1, 1994

                          Decided:  November 22, 1994

Filed:

                            Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Appellant Brand E. Caekaert filed a petition in the Workers' Compensation Court for the State of Montana in which he sought medical and disability benefits from the State Compensation Mutual Insurance Fund (State Fund). The Workers' Compensation Court denied Caekaert's petition. He appeals that decision. We reverse the judgment of the Workers' Compensation Court.

The following issues are presented on appeal:

1. Did the Workers' Compensation Court err when it denied Caekaert's claim for medical expenses?

2. Did the Workers' Compensation Court err when it denied Caekaert's claim for temporary total disability benefits?

3. Did the Workers' Compensation Court err when it denied Caekaert's claim for reasonable attorney fees and costs?

## FACTUAL BACKGROUND

Caekaert is a journeyman plumber residing in Billings. He also owns an independent poultry business that he began in approximately 1987. In January 1988, Caekaert began working as a plumber for Frank Wilson Plumbing and Heating. In early February 1988, Dr. S. Arthur Frankel determined that Caekaert was suffering from bilateral carpal tunnel syndrome. On February 10, and March 2, 1988, Dr. Frankel performed median nerve release procedures on Caekaert's left and right hands respectively. The State Fund insured Caekaert's employer at the time the carpal tunnel syndrome was diagnosed. In November 1988, Caekaert filed a claim for benefits under the Montana Occupational Disease Act. The

State Fund accepted liability, covered the medical expenses, and paid Caekaert temporary total disability benefits.

As early as May 1988, Caekaert visited other doctors to complain of recurring symptoms. In June and July 1988, Dr. Richard P. Lewallen, an orthopedic surgeon in Billings, referred Caekaert to Dr. Donald H. See, a neurologist, for nerve conduction tests. Dr. See's tests indicated that the condition of Caekaert's right median nerve had worsened. Following these tests, Caekaert was referred to Dr. Jeffrey Hansen, Dr. Lewallen's partner, who specializes in carpal tunnel surgery. Dr. Hansen has remained Caekaert's treating physician for his symptoms related to carpal tunnel entrapment since July 7, 1988.

Dr. Hansen formed the opinion that Dr. Frankel's surgeries were unsuccessful and concluded that re-exploration surgery on both hands was necessary. Dr. Hansen also concluded that Caekaert's symptoms became worse following the surgeries performed by Dr. Frankel. Dr. Hansen and Dr. Lewallen were additionally concerned that Caekaert's median nerve was compressed not only at his wrist, but at his elbow. Despite these opinions, Dr. Hansen adopted a conservative approach to treatment because Caekaert was uncertain about further surgery. Dr. Hansen decided to wait and see if Caekaert's condition would improve.

In November 1992, Caekaert's hands reached the point where he felt surgery was again necessary. Dr. Hansen explained that the re-exploration procedures were necessary to alleviate the same symptoms that existed in June and July of 1988. On December 11,

3

1992, Dr. Hansen performed surgery for release of the median nerve at Caekaert's right wrist and just below his right elbow. On February 12, 1993, Dr. Hansen performed another release procedure for the median nerve at Caekaert's left wrist and elbow. Dr. Hansen testified that the 1992 and 1993 surgeries left Caekaert totally disabled for six to eight weeks following each surgical procedure.

Between the 1988 procedures and the 1992 and 1993 procedures, Caekaert worked sporadically. On June 27, 1988, Caekaert briefly returned to work as a plumber for Star Service. On July 15, 1988, while working for Star Service at St. Vincent's Hospital, Caekaert injured his back. He returned to work for Star Service at a Reedpoint job site after a couple of weeks. In September, he quit his job with Star Service, claiming that the commute to Reedpoint from Billings hurt his back and that his hands still bothered him. Caekaert also worked periodically doing various jobs for his poultry business.

Following the 1992 and 1993 surgeries, Caekaert submitted his medical bills to the State Fund. However, the State Fund denied liability. Caekaert then petitioned the Workers' Compensation Court for an award of medical expenses and disability benefits. After trial, the Workers' Compensation Court concluded that the State Fund was not liable.

In its Finding No. 18, the court found that Caekaert, in depositions and interrogatories in a separate claim related to his back injury, stated that his carpal tunnel syndrome did not prevent

4

him from working and that his symptoms dramatically improved after surgery. In its Finding No. 14, the court found that Caekaert, in the previous litigation, claimed that he was permanently totally disabled from the back injury. In its Finding No. 22, the court noted that Dr. Hansen stated that Caekaert had reached "medical stability" on May 18, 1989. The court also pointed out that between 1988 and 1992 Caekaert continued to work in his poultry business, and in Finding No. 26, expressed skepticism regarding Caekaert's testimony that he did as little strenuous work as possible in that business. In Finding No. 34, the court observed that Dr. Hansen stated that Caekaert's activity between the surgeries probably incrementally increased the problem, but Dr. Hansen stated that it was a difficult question of causation. Finally, in Finding No. 35, the court found that Dr. Hansen's testimony, and Caekaert's activity in the poultry business, established that Caekaert's activity made his condition permanently worse.

The court's conclusions of law are also important to this appeal. In Conclusion No. 2, the court concluded that because Caekaert's work in the poultry business aggravated his carpal tunnel problem, the State Fund is not responsible for the medical expenses or the temporary total disability benefits. In Conclusion No. 4, the court stated that Caekaert's claim for temporary total disability is barred by judicial estoppel because in previous litigation he claimed that his back injury left him permanently and totally disabled. The court concluded that because Caekaert

5

claimed the back injury left him permanently disabled, he suffered no lost earnings after the 1992 and 1993 surgeries. The court noted that Caekaert was not judicially estopped from receiving medical benefits because previous testimony established that his 1988 carpal tunnel surgeries were not 100 percent successful. Finally, the court concluded that Caekaert was not entitled to recover his attorney fees or costs. Caekaert appeals from these findings and conclusions.

<u>DISCUSSION</u>

<u>ISSUE 1</u>

Did the Workers' Compensation Court err when it denied Caekaert's claim for medical expenses?

In reviewing a Workers' Compensation Court decision, this Court examines whether the court's findings of fact are supported by substantial credible evidence. *Buckentin v. State Compensation Ins. Fund* (Mont. 1994), 878 P.2d 262, 263, 51 St. Rep. 656, 657. If there is conflicting evidence, we examine whether substantial evidence supports the Workers' Compensation Court, not whether the evidence might support contrary findings. *Buckentin*, 878 P.2d at 263. We review the Workers' Compensation Court's conclusions of law to decide whether the court's determination of the law is correct. *Stordalen v. Ricci's Food Farm* (1993), 261 Mont. 256, 258, 862 P.2d 393, 394. Where medical testimony is offered by deposition, this Court sits in as good a position as the Workers' Compensation Court to determine the weight of the medical testimony. *McIntyre v. Glen Lake*

6

*Irrigation Dist.* (1991), 249 Mont. 63, 67, 813 P.2d 451, 454. Nonetheless, the medical testimony must be considered in the context of other testimony that the trial court did in fact have an opportunity to observe if it is relevant to medical issues. *McIntyre*, 813 P.2d at 454.

It is undisputed that the State Fund accepted responsibility for the 1988 surgeries. The issue is whether the State Fund, as the initial insurer, remains liable for the subsequent surgery.

Caekaert claims he is entitled to wage benefits and medical expenses based on § 39-72-704, MCA (1987), which provides:

> In addition to the compensation provided by this chapter, an employee who becomes either totally or partially disabled from an occupational disease is <u>entitled to receive for treatment of the occupational disease, without limitation as to length of time or dollar amount, reasonable medical services, hospitalization, medicines, and other treatment</u> approved by the division.

(Emphasis added.)

In response, the State Fund contends it is not responsible for the 1992 and 1993 surgeries because Caekaert aggravated his condition by working in the poultry business between 1988 and 1992. The State Fund asserts that the Workers' Compensation Court correctly concluded that the "last injurious exposure doctrine" applies. *See Belton v. Carlson Transport* (1983), 202 Mont. 384, 389, 658 P.2d 405, 408 (holding once a claimant reaches maximum healing or a medically stable condition, the initial insurer at risk is not responsible for subsequent injuries or conditions); *EBI/Orion Group v.*

*State Compensation Mutual Ins. Fund* (1991), 249 Mont. 449, 452, 816 P.2d 1070, 1072. Montana statutorily recognizes a version of the last injurious exposure rule in occupational disease cases. Section 39-72-303(1), MCA, provides that "[w]here compensation is payable for an occupational disease, the only employer liable <u>is the employer in whose employment the employee was last injuriously exposed to the hazard of the disease</u>." (Emphasis added.)

We have not construed this statute, but Larson's Workmen's Compensation Law treatise states that recurrences of disabilities in occupational disease cases should be treated the same as accidental injury cases. Larson § 95.27. Larson also recognizes that:

> [W]hen disability has once resulted from occupational disease, a second disability occurring under a different carrier will be chargeable to the first carrier <u>if it is a recurrence of the first disability. The persistence of symptoms in the meantime, and the failure to demonstrate an incident that can independently explain the second onset</u>, are strong grounds for finding a mere recurrence
> . . . .
>
> . . . .
>
> However, if the later exposure should increase the degree of disability caused by the initial exposure, the second carrier might become responsible; but in such a case it would be necessary to distinguish carefully between the increased disability from natural progress of the disease and that resulting from the added exposure.

Larson § 95.27 (emphasis added). The State Fund asserts that Caekaert's activity between surgeries actually and proximately caused the need for additional surgeries. The statutory language indicates that the only employer liable is the employer where the employee was last injuriously exposed. As the language from Larson

indicates, the first insurance company is liable for the second disability if it is a recurrence.

To succeed in its last injurious exposure defense, the State Fund must show that the subsequent surgeries did not result from Caekaert's initial occupational disease. In other words, for the last injurious exposure rule to apply, there must be evidence of a second injury or injurious exposure that materially or substantially contributed to Caekaert's symptoms from carpal tunnel syndrome. *See Peterson v. Eugene F. Burrill Lumber* (Or. 1983), 660 P.2d 1058, 1061.

A later injury is compensable by the original carrier if it is a direct and natural result of a compensable primary injury, and not the result of an independent intervening cause attributable to the claimant. *Rightnour v. Kare-Mor, Inc.* (1987), 225 Mont. 187, 189, 732 P.2d 829, 830-31. If the original injury or occupational disease was the cause of the current condition, the State Fund is liable.

Applying the rules for review set forth previously, and the above law, we then consider the medical evidence pertaining to this issue.

The only medical testimony offered at the trial of this case was that of Dr. Hansen, which was offered by deposition. He testified that although excellent relief was observed by Dr. Frankel a week or two after the 1988 surgery on Caekaert's wrists, most of the symptoms had returned by several months after those surgical procedures. Based on that development, both he and

9

Dr. Lewallen shared the opinion that the nerve had either been overgrown by scar tissue, was again entrapped by a ligament, or had actually been compressed at more than the level at which it was released.

Dr. Hansen unequivocally testified that Caekaert's carpal tunnel syndrome had not improved following the original surgery, and, based on nerve conduction studies, his opinion was that the condition had worsened. As a result, as early as July 1988 both he and Dr. Lewallen were of the opinion that re-exploration surgery would be necessary--long before Caekaert did the work on his poultry farm to which the Workers' Compensation Court attributed his 1992 and 1993 surgical procedures.

Dr. Hansen testified that in November 1992, when Caekaert finally consented to undergo further surgical treatment, he was basically suffering from the same condition for which Dr. Frankel had treated him in 1988. He gave the following unequivocal opinion when asked whether the surgical procedures he performed in 1992 and 1993 were necessary due to the condition for which he originally saw Caekaert in 1988:

> Q.  Dr. Hansen, is it your opinion that the releases that you are referring to here in Exhibits 9 and 10 were done to alleviate the condition that existed for as long as you treated Mr. Caekaert?
>
> A.  Yes, I feel that quite strongly.
>
> Q.  And is that opinion based on a reasonable medical probability?
>
> A.  Yes, I believe it is.

After describing what he observed during the surgeries that he performed, Dr. Hansen gave the following additional opinion testimony:

Q. In January of '89, now that you have done the operations, do you believe that you would have found the conditions that you found upon operating back in January '89?

. . . .

Q. Do you understand my question?

A. Yes. I think the findings would have been identical if we would have done the operation, you know, a month after we first saw him.

The only testimony that Dr. Hansen gave which related Caekaert's condition for which the 1992 and 1993 surgeries were performed to a particular event, related it to the condition in which Caekaert found himself following his 1988 surgical procedures for which the State Fund has accepted liability. In answer to questions posed on cross-examination, Dr. Hansen did concede that Caekaert's conditions worsened periodically in relation to the extent of his activities, but explained that worsened symptomatology and worsened condition are not the same thing. He also pointed out that every time Caekaert discontinued working on his poultry farm, his condition basically went back to the baseline state that Dr. Hansen observed when he originally examined him. He testified that while continued activity may worsen the type of condition for which he treated Caekaert, the amount was not quantifiable and, while he did acknowledge that the type of activity Caekaert engaged in on the poultry farm can lead to a

11

progression of symptoms, at no time did he express an opinion that the surgery he performed in 1992 and 1993 was necessary because of a progression of Caekaert's symptoms. His testimony was clearly that whether Caekaert's symptoms worsened over time or not, the additional surgical procedures that he performed were necessary due to the condition that he believed existed when he first saw Caekaert in July 1988.

Toward the end of the State Fund's cross-examination of Dr. Hansen, he made the following concluding remark:

A.     Basically he [had] about the same indications all
        along, maybe a little bit worse now, but really not
        a lot different than he did very early on in his
        care . . . .

We have recognized that, in cases where a claimant is reinjured before the first injury reaches a medically stable condition, and the first insurer disclaims coverage, the burden of proof falls on the insurance company at risk at the time of the accident the claimant alleges causes his injury. *Belton*, 658 P.2d at 409-10; *O'Brien v. Central Feeds* (1990), 241 Mont. 267, 272, 786 P.2d 1169, 1172. In *EBI/Orion*, we noted that to avoid liability, the initial insurer must show that (1) the claimant reached maximum healing; and (2) that he or she sustained an injury after reaching maximum healing. *EBI/Orion*, 816 P.2d at 1072.

In *O'Brien*, the claimant received numerous injuries under different insurers. Doctors testified that although it was possible that a number of events could have aggravated conditions

after claimant's original injury, the original injuries were more likely than not related to his present condition. *O'Brien*, 786 P.2d at 1171. We reasoned that there was no conclusive evidence that the claimant reached maximum healing before the subsequent injury. Although a doctor testified that it was possible that other events could have aggravated the claimant's condition, we concluded that medical possibility, absent more persuasive evidence, is not enough to prove a claimant reached maximum healing before subsequent employment. *O'Brien*, 786 P.2d at 1172. We also stated that a medical release to return to work is not sufficient to establish maximum healing. *O'Brien*, 786 P.2d at 1172-73.

In this case, the State Fund had the burden of proving that Caekaert reached maximum healing. It had to sufficiently explain the second onset, proving it was not a recurrence of symptoms from the 1988 surgeries for which it accepted liability. However, it did not introduce sufficient evidence to establish that Caekaert reached maximum healing, or that he reinjured himself.

Dr. Hansen supplied medical testimony, by deposition, regarding the 1992 and 1993 surgeries. He testified that almost immediately following the 1988 surgeries Caekaert required additional surgery. He also testified, consistent with Dr. Lewallen's opinion, that the later surgeries required releases of the median nerves at both elbows. Any suggestions in Dr. Hansen's testimony that Caekaert's activity subsequent to 1988 contributed to his current condition was equivocal at best and does not change

13

the fact that surgery was necessary before any "possible" aggravation occurred. Moreover, medical possibility, absent more persuasive evidence, is not sufficient to establish that Caekaert's activity caused a subsequent injurious exposure which would relieve the State Fund of liability. *See O'Brien*, 786 P.2d at 1172. Because the State Fund did not offer substantial evidence that a second event or exposure caused Caekaert to undergo surgical procedures in 1992 and 1993, the Workers' Compensation Court incorrectly concluded that the last injurious exposure rule barred Caekaert's claim.

For these reasons, we conclude that the Workers' Compensation Court erred by not holding the State Fund liable for Caekaert's medical expenses following the second set of surgical procedures.

### ISSUE 2

Did the Workers' Compensation Court err when it denied Caekaert's claim for temporary total disability benefits?

Although the above analysis also supports awarding Caekaert temporary total disability benefits following the 1992 and 1993 surgeries, the Workers' Compensation Court concluded that Caekaert was judicially estopped from asserting this claim.

The Workers' Compensation Court concluded that because Caekaert, in depositions and affidavits in litigation following his 1988 back injury, claimed that the back injury left him permanently and totally disabled, he is now estopped from claiming temporary total disability. In other words, because he claimed his back

injury rendered him unable to earn income, he suffered no lost wages following the 1992 and 1993 hand surgeries.

We previously recognized the doctrine of judicial estoppel in *Rowland v. Klies* (1986), 223 Mont. 360, 726 P.2d 310. Under this doctrine, we do not permit litigants to assert inconsistent and contradictory positions in separate litigation. The clearest reason for the rule is to prevent parties from playing "fast-and-loose with the courts." *Rowland*, 726 P.2d at 315. To give rise to judicial estoppel, the first representation must have been made knowingly and free from the other party's inducement; it applies particularly to admissions or positions asserted under oath or in previous litigation. *Rowland*, 726 P.2d at 315. In *Rowland*, we also cited a Texas case for the proposition that judicial estoppel does not apply when the previous position is uncertain or based on facts not yet determined. *Rowland*, 726 P.2d at 316 (citing *LaChance v. McKown* (Tex. Ct. App. 1983), 649 S.W.2d 658, 660).

Although we agree with the above stated principles of judicial estoppel, that doctrine does not apply here. Caekaert did not offer inconsistent testimony in a previous case. He previously claimed that his back pain was so severe that it forced him to quit working for Star Service and left him with no earning capacity. However, Caekaert had injured his back and was merely describing his physical condition following that injury. Caekaert did not, and because he is not a medical professional, could not, anticipate the duration of his disability from that injury.

The State Fund contends on appeal that the real basis for applying judicial estoppel is testimony given by Caekaert in 1991 that the condition of his hands at that time did not preclude him from returning to work. However, the State Fund's argument, as well as the trial court's conclusion, confuses the concepts of "permanent total disability," "permanent partial disability," and "temporary total disability."

Permanent total disability, according to the terms in effect at the time that Caekaert's condition occurred, referred to a worker who had reached maximum healing and was unable to return to work in his job pool. Section 39-71-116(15), MCA (1987). Permanent partial disability referred to a worker who had reached maximum healing but was left with physical restrictions which affected his wages. Section 39-71-116(14), MCA (1987).

The only disability benefits sought in this case are temporary total disability benefits. Those are awarded to a worker who sustains a total loss of wages because he has not yet reached maximum healing. Section 39-71-116(21), MCA (1987). It was Dr. Hansen's undisputed testimony that Caekaert would be temporarily totally disabled for six to eight weeks following each of the procedures that he performed in 1992 and 1993. Whether he was able to work prior to those surgical procedures in spite of median nerve symptomatology, and whether at some time several years earlier he was totally unable to work because of back complaints, is irrelevant. The record established that although Caekaert was unable to return to work as a plumber because of his back injury,

he did return to some form of gainful employment prior to the surgeries performed by Dr. Hansen and was subsequently removed from any form of occupation for a short period of time due to further surgery.

We conclude that Caekaert's prior testimony regarding the impact of his back injury on his ability to work as a plumber, and his prior statements regarding his ability to work in spite of ongoing symptoms from carpal tunnel syndrome, are not inconsistent with his claim for temporary total disability benefits while he recovers from the surgical procedures that were performed in 1992 and 1993. Therefore, we conclude that he is not judicially estopped from claiming and receiving temporary total disability benefits in this case.

## ISSUE 3

Did the Workers' Compensation Court err when it denied Caekaert's claim for reasonable attorney fees and costs?

Caekaert requested the Workers' Compensation Court to award attorney fees and a statutory penalty under §§ 39-71-611 and -2907, MCA (1987). Section 39-71-611, MCA, provides for attorney fees if the insurer was unreasonable. Likewise, § 39-71-2907, MCA, provides for statutory penalties where the insurer unreasonably delays or refuses to pay compensation. The issue of reasonableness is one for the Workers' Compensation Court to decide, based on all of the evidence. Therefore, this case is remanded to the Workers' Compensation Court for reconsideration of the attorney fee and

17

penalty issues, after taking into consideration this decision, and all of the evidence.

The judgment of the Workers' Compensation Court is reversed and this case is remanded for the limited purpose of considering Caekaert's claim for attorney fees, costs, and the statutory penalty, and the duration of any temporary total disability benefits to which Caekaert is entitled.

_____
                    Justice

We concur:

_____

_____

_____

_____
        Justices

18