No. 96-368

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


LIBERTY NORTHWEST INSURANCE CORP.,

Petitioner and Appellant,

STIMSON LUMBER COMPANY,

Employer and Appellant,

v.

CHAMPION INTERNATIONAL CORP.,

Respondent and Respondent.



APPEAL FROM:    Workers' Compensation Court for the State of Montana
                The Honorable Mike McCarter, Judge presiding.


COUNSEL OF RECORD:

For Appellants:

Larry W. Jones, Senior Attorney; Liberty Northwest Insurance
                Corp.; Missoula, Montana

For Respondent:

Bradley J. Luck; Garlington, Lohn & Robinson;
                Missoula, Montana



                        Submitted on Briefs: February 13, 1997

                        Decided:   October 10, 1997
                        Filed:


_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The petitioner, Liberty Northwest Insurance Corporation, which insures the Stimson Lumber Company against workers' compensation claims, filed a petition in the Workers' Compensation Court of the State of Montana in which it sought a decision from that court that the disability of Stimson's employee, Ronald Deschamps, was the result of an injury he sustained while employed by Champion International Corporation and, therefore, that Liberty was entitled to indemnification for benefits it paid to Deschamps. The Workers' Compensation Court held that Deschamps' disability was related to activities he performed while employed by Stimson and, therefore, that Liberty is not entitled to indemnification. Liberty appeals from that decision. We affirm the judgment of the Workers' Compensation Court.

The dispositive issue on appeal is whether the Workers' Compensation Court's finding that Deschamps' disability was caused by work-related activities performed during the course of his employment with Stimson Lumber Company is supported by substantial evidence.

### FACTUAL BACKGROUND

The parties agree that Ronald Deschamps injured his lower back on March 30, 1992, while working for Champion International in Missoula. His treating physician, Michael A. Sousa, M.D., diagnosed degenerative disc disease with a slight bulge in the disc between his fifth lumbar vertebra and his first sacral vertebra. Champion accepted liability for Deschamps' injury and paid his medical and disability benefits.

By June 25, 1992, Dr. Sousa's records indicate that Deschamps had regained full range of motion and that most of his pain was gone. On July 6, 1992, he released Deschamps to return to work at Champion as a millwright with no restrictions.

By November 17, 1992, Dr. Sousa described Deschamps' problems as "minimal." On January 28, 1993, Dr. Sousa verified, in a letter to Champion, that Deschamps had reached maximum medical improvement and that his condition was stable. At that time, he had pain at the extreme extensions of his range of motion, but otherwise appeared to be doing well.

Although Deschamps was employed by Champion as a millwright, which was classified as a heavy duty job and involved machinery repair, he had been limited to lighter duty carpentry work since undergoing an angioplasty in 1990. When he returned to work following his back injury in July 1992, it was as a light duty carpenter.

During early November 1993, Champion's Missoula mill was purchased by Stimson Lumber Company. Shortly before that purchase, or shortly thereafter, Deschamps was given a pre-employment medical examination to assure that he was physically capable of performing a millwright's duties. As a result of that examination, he was found to be qualified to work as a millwright without restrictions.

Deschamps continued working at the mill following Stimson's takeover. For the

first several months, he continued to work as a light duty carpenter; however, eventually
he was assigned to heavier duty millwright work.  Following the change in his work
activities, his back became progressively worse.  On June 8, 1995, Deschamps was told
by Dr. Sousa that he could no longer continue working as a millwright due to his low
back pain.  He has not returned to work since that time.

During 1994, Deschamps sought additional benefits from Champion due to the
physical problems he was experiencing; however, Champion denied liability.  In 1995,
Liberty accepted liability for Deschamps' claim as an occupational disease.  However,
on July 20, 1995, Liberty requested that Champion accept liability for Deschamps'
disability.  Champion declined to do so.

After a hearing at which Deschamps and Dana M. Hedapohl, M.D., testified, and
after consideration of the testimony of Dr. Sousa by deposition, the Workers'
Compensation Court found that Deschamps' work for Stimson accelerated and
significantly aggravated his preexisting degenerative disc disease, and that his
disability
was not a mere result of the natural progression of his underlying condition and,
therefore, concluded that Stimson was not entitled to indemnification from Champion.

## DISCUSSION

Was there substantial evidence to support the Workers' Compensation Court's
finding that Deschamps' work for Stimson Lumber Company accelerated and significantly
aggravated his preexisting degenerative disc disease, and that his disability is not
the
result of a natural progression of his underlying condition?

We review the Workers' Compensation Court's findings of fact for substantial
credible evidence.  See Buckentin v. State Comp. Ins. Fund (1994), 265 Mont. 518,
520,
878 P.2d 262, 263.  If there is conflicting evidence, we consider whether substantial
evidence supports the court's findings, not whether other evidence supports contrary
findings.  See Buckentin, 265 Mont. at 520, 878 P.2d at 263.  Where medical testimony
is offered by deposition, this Court is in as good a position as the trial court to
determine
the weight of the medical testimony.  However, deposition testimony must be reviewed
in the context of testimony from other witnesses who gave testimony that the trial
court
did, in fact, have an opportunity to observe.  See McIntyre v. Glen Lake Irrigation
Dist.
(1991), 249 Mont. 63, 67, 813 P.2d 451, 454.

In Caekaert v. State Compensation Mutual Insurance Fund (1994), 268 Mont. 105,
111, 885 P.2d 495, 499, we noted that:
Montana statutorily recognizes a version of the last injurious exposure rule
in occupational disease cases.  Section 39-72-303(1), MCA, provides that
"[w]here compensation is payable for an occupational disease, the only
employer liable is the employer in whose employment the employee was last
injuriously exposed to the hazard of the disease."

In Caekaert, we quoted, with approval, from   95.27 of Larson's Workmen's
Compensation Law, which provides that:
[W]hen disability has once resulted from occupational disease, a second
disability occurring under a different carrier will be chargeable to the first
carrier if it is a recurrence of the first disability. The persistence of
symptoms in the meantime, and the failure to demonstrate an incident that

can independently explain the second onset, are strong grounds for finding
a mere recurrence . . . .

       . . . .

       However, if the later exposure should increase the degree of
disability caused by the initial exposure, the second carrier might become
responsible; but in such a case it would be necessary to distinguish carefully
between the increased disability from natural progress of the disease and
that resulting from the added exposure.

Caekaert, 268 Mont. at 111, 885 P.2d at 499 (quoting Larson   95.27).
       Based on these rules, we concluded in Caekaert that "for the last injurious
exposure rule to apply, there must be evidence of a second injury or injurious
exposure
that materially or substantially contributed to Caekaert's symptoms from carpal
tunnel
syndrome."  Caekaert, 268 Mont. at 112, 885 P.2d at 499.
       On appeal, Stimson first contends that the Workers' Compensation Court erred by
misapplying the Caekaert rule.  It argues that the court did not distinguish between
a
worsened anatomical condition for which the second employer would be liable, and
worsening symptoms for which the second employer is not liable.  However, we conclude
that that is not a correct interpretation of the Workers' Compensation Court's
decision.
That court specifically found, at Finding of Fact No. 59, that:
       Based on all of the medical testimony, and claimant's description of
his increased symptoms after being transferred back to a millwright
position, I find that claimant's work at Stimson accelerated and significantly
aggravated his pre-existing degenerative back condition.  While other
factors, including other medical conditions, may have contributed to his
overall perception of his pain, his work at Stimson was a significant factor
in his increasing pain and, ultimately, his inability to work.

(Emphasis added.)
       It was based on this finding, and its application of the Caekaert decision to
this
finding, that the Workers' Compensation Court concluded that Stimson was liable for
Deschamps' disability.  We conclude, therefore, that the Workers' Compensation Court
did not misapply the Caekaert decision.
       Stimson's second and principal contention on appeal is that Finding No. 59 is
not
supported by substantial evidence.  However, after our review of the record, we
conclude
that there was, in fact, substantial evidence to support the Workers' Compensation
Court's finding that Deschamps' current disability is related to his work activities
on
behalf of Stimson.
       Deschamps testified that by March 1993 his physical problems from his 1992
injury had stabilized and were minimal.  However, when he saw Dr. Sousa again in
April
1994 after he had been working for Stimson for nearly six months, he had different

problems than before and was not doing as well as he had been. He was experiencing pain in his hip, left leg, and right groin. He testified that his back-related physical limitations changed dramatically from November 1, 1993, to June 1995 when he was taken off work. He could do the work he was released to do in November 1993. He could not do the work in June 1995.

Deschamps testified that when he started working for Stimson following the pre-employment physical examination done on behalf of Stimson, he was able to and was authorized to work without restriction. However, by the time he left his job he could no longer perform his responsibilities. Finally, he expressed the opinion that the work he did while employed by Stimson did make his condition worse.

Finally, during his deposition, Deschamps gave the following testimony:

Q. And since you happened to be working for Stimson for those two years, apparently the work activity at Stimson made it [his back] worse?

A. Work made it worse while I was working at Stimson.

. . . .

Q. . . . It is your feeling that during those two years, the work at Stimson did make your back condition worse?

A. Yes.

Q. How about your arm conditions? Did they get worse during those two years?

A. Yes.

Q. Do you think your work at Stimson helped make those conditions worse?

A. Yes.

Stimson is correct that it was Dr. Hedapohl's opinion that Deschamps' back injury was not permanently aggravated or worsened during his employment with Stimson, but that only his symptoms were temporarily aggravated, and that if his permanent disability is worse now than before, it is the result of a natural deterioration of the condition with which he began employment for Stimson. Stimson is also correct that Dr. Sousa had originally expressed the opinion that Deschamps' disability for which he was taken off work in June 1995 was the result of a natural progression of the disease caused by his injury sustained while working for Champion. However, after considering the history of Deschamps' complaints and physical limitations before and after his Stimson employment, Dr. Sousa agreed that a logical conclusion from that history was that by

the time Deschamps terminated his employment, his back condition and his capabilities had changed dramatically since November 1993.  He testified that, in his opinion, Deschamps was injured at Champion, but that his condition had stabilized.  He then went to work for Stimson for eighteen months and aggravated the underlying condition in his lower back.

Dr. Sousa gave the following testimony in response to the following questions:

Q.    So with that weakened event, it's more probable than not that 18 months as a millwright [for Stimson] caused a permanent aggravation of the underlying condition?

A.    You know, his condition and complaints would be consistent with a permanent aggravation. . . .

. . . .

Q.    And it's more probable than not that he would attribute that change in condition, change in ability to work, to the 18 months of millwright work at Stimson?

A.    Something definitely happened in the interim, so, you know, there's a probable relationship there.

        Dr. Sousa expressed the opinion that if Deschamps was credible regarding his history of complaints and the extent of his disability, then there was a causal relationship between his work activities at Stimson and a deterioration of his physical condition.

        The Workers' Compensation Court found, based on its observation of Deschamps' testimony, that he had been truthful.

        Based on this evidence, we conclude that the Workers' Compensation Court's finding that the condition of Ronald Deschamps' back disease was significantly aggravated by his employment at Stimson Lumber Company is supported by substantial evidence and that, based on that finding, the Workers' Compensation Court correctly assigned liability for Deschamps' disability and medical benefits to the employer for whom he was working at the time of his "last injurious exposure."

        The judgment of the Workers' Compensation Court is affirmed.

                        /S/   TERRY N. TRIEWEILER

We Concur:

/S/   JAMES C. NELSON
/S/   W. WILLIAM LEAPHART
/S/   KARLA M. GRAY
/S/   WILLIAM E. HUNT, SR.