DA 06-0404

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 102

JASON HARRISON,

  Petitioner and Appellee,

 v.

LIBERTY NORTHWEST INSURANCE CORPORATION,

  Respondent and Appellee,

 and

STILLWATER MINING COMPANY,

  Respondent and Appellant.

APPEAL FROM:  Montana Workers' Compensation Court, WCC No. 2005-1222
       Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

      James R. Hintz, Crowley, Haughey, Hanson, Toole & Dietrich, P.L.L.P.,
      Billings, Montana

    For Appellee Harrison:

      Andrew J. Utick, Utick Law Firm, Helena, Montana

    For Appellee Liberty Northwest Insurance Corporation:

      Larry W. Jones, Law Offices of Larry W. Jones, Missoula, Montana

Submitted on Briefs: January 31, 2007

Decided: April 1, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 In November 2002 Jason Harrison (Harrison) filed an occupational disease claim while working for Stillwater Mining Company (Stillwater) in Columbus, Montana. After treatment and achieving maximum medical improvement (MMI), Harrison and Stillwater entered into a settlement agreement under which medical benefits were reserved. Subsequently, Harrison went to work for Derek Brown Construction Company (Derek Brown). He suffered an industrial injury in April 2004. Derek Brown's insurer, Liberty Northwest Insurance Corporation (Liberty), paid Harrison's medical benefits including the necessary spinal surgery under a reservation of rights. In January 2005 Harrison filed a Petition in the Workers' Compensation Court (WCC) to determine whether Stillwater or Derek Brown was responsible for his medical claim. The WCC determined that Stillwater was liable. Stillwater appeals. We affirm.

## ISSUE

¶2 The dispositive issue on appeal is whether the WCC erred in concluding that Stillwater was responsible for payment of Harrison's medical costs and disability benefits.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Harrison worked for Stillwater as an underground equipment operator from May 2000 until July 2003. On November 13, 2002, he reported to his employer that he was suffering from lower back and neck pain as a result of his job duties. Shortly thereafter Harrison saw a physician, Dr. McDowell, and reported that he was experiencing lower back pain, radicular leg pain, neck discomfort, and some tingling and numbness in his

3

arms. He told the doctor he had been experiencing these symptoms for approximately six months and attributed them to his work at Stillwater. On December 3, 2002, Stillwater accepted Harrison's claim under the Occupational Disease Act and provided him temporary total disability benefits. In January 2003, upon Dr. McDowell's recommendation, Harrison began seeing a neurologist named Dr. Quenemoen. He saw Quenemoen on several occasions between January and June 2003 for tests and treatment. In May 2003 Quenemoen told Stillwater that Harrison had reached maximum medical improvement. In July Quenemoen restated that Harrison was at MMI with a total whole person impairment of 5 percent.

¶4 After Harrison left his job at Stillwater he moved to Helena, Montana, to enroll in the September 2003 term at Helena College of Technology (HCT) for vocational re-training. Also in September 2003 the Montana Department of Labor and Industry (DOLI) Employment Relations Division approved a settlement agreement between Harrison and Stillwater. Under this agreement Stillwater paid Harrison $20,339 and Harrison reserved further medical and hospital benefits.

¶5 Harrison did not complete vocational re-training at HCT but rather left Helena and moved to Fort Benton, Montana, for family reasons in October 2003. While in Fort Benton, Harrison worked for a builder for approximately one month doing residential construction, remodeling, carpentry, drywall, and some concrete work. After about a month in Ft. Benton, Harrison returned to Helena and worked various short term construction, equipment maintenance and carpentry jobs until he began working for Derek Brown in mid-April 2004. During the time between his jobs at Stillwater and

4

Derek Brown, his back pain subsided but he continued experiencing numbness and tingling in his legs and he occasionally took the medications prescribed by Quenemoen. On April 23, 2004, Harrison suffered a back injury while running a vibrator machine during a concrete pour at a Derek Brown work site. He submitted a claim for compensation to Derek Brown on April 29, 2004. On the claim form, Harrison indicated that he believed that he had aggravated his low back condition by performing the heavy concrete work.

¶6 In May 2004 Harrison began seeing Dr. Varnavus, a neurosurgeon, for diagnosis and treatment. In June 2004 Liberty, Derek Brown's insurer, denied Harrison's injury claim but in July 2004 agreed to cover the claim. Varnavus indicated in a September 2004 letter to Liberty that he believed Harrison's condition was directly connected to the injury Harrison incurred while working for Stillwater. After extended but unsuccessful treatment, Varnavus recommended spinal surgery. In October 2004 Liberty refused to authorize the recommended surgery and in November Liberty notified Harrison that it was terminating payment of benefits.

¶7 On January 10, 2005, Harrison filed a Petition for an Emergency Hearing with the WCC. On January 11, 2005, then-WCC Judge McCarter held a telephone conference with counsel for Harrison, Liberty and Stillwater, at the conclusion of which Liberty agreed to pay Harrison's reasonable medical expenses including surgical expenses subject to a claim for indemnification from Stillwater. Harrison's surgery was performed in July 2005.

¶8 On May 12, 2006, WCC Judge Shea issued his Findings of Fact, Conclusions of Law and Judgment. The court made numerous findings pertaining to Harrison's various physicians' tests, diagnoses and treatments. The WCC concluded, among other things, that (1) Liberty had the burden of proving, by a more-probable-than-not standard, that Stillwater was the responsible party; (2) Varnavus was the only treating physician to offer an opinion as to whether Harrison's injury while working at Derek Brown arose from his earlier injury at Stillwater; (3) Harrison and Stillwater, at the time they entered into their settlement agreement, were operating under the mutual and material mistake of fact that surgery would not be required for Harrison's injury; (4) such a mutual mistake warrants the reopening of the settlement agreement; and (5) Stillwater must indemnify Liberty for the payments Liberty made to Harrison.

¶9 Stillwater filed a timely appeal of the WCC's ruling.

## STANDARD OF REVIEW

¶10 The standard of review we employ for this type of case was set forth in detail in *Gamble v. Sears*, 2007 MT 131, ¶¶ 20-22, 337 Mont. 354, ¶¶ 20-22, 160 P.3d 537, ¶¶ 20-22. As this detailed standard is applicable to the case before us, we repeat it in its entirety.

¶11 We conduct de novo review of the WCC's conclusions of law in order to determine whether they are correct. *Flynn v. Uninsured Employers' Fund*, 2005 MT 269, ¶ 11, 329 Mont. 122, ¶ 11, 122 P.3d 1216, ¶ 11. As for the WCC's findings of fact, however, our review is both deferential and limited in scope. We simply review the WCC's factual findings to determine whether they are supported by substantial credible

6

evidence.  *In re Abfalder*, 2003 MT 180, ¶ 10, 316 Mont. 415, ¶ 10, 75 P.3d 1246, ¶ 10. We have stated that substantial credible evidence is that which a reasonable mind could accept as adequate to support a conclusion.  *Simms v. State Compensation Ins. Fund*, 2005 MT 175, ¶ 11, 327 Mont. 511, ¶ 11, 116 P.3d 773, ¶ 11.  Indicating the high level of deference this Court accords to the WCC's factual findings, we have stated that evidence will be considered substantial even if it is contradicted by other evidence, even if it is somewhat less than a preponderance, and even if it is inherently weak.  *EBI/Orion Group v. State Compensation Mut. Ins. Fund*, 249 Mont. 449, 453, 816 P.2d 1070, 1073 (1991); *Simms*, ¶ 11; *Wolfe v. Webb*, 251 Mont. 217, 230, 824 P.2d 240, 248 (1992).  However, it must be more than a mere "scintilla" of evidence and it must rise above the level of "trifling or frivolous."  *Simms*, ¶ 11; *EBI/Orion Group*, 249 Mont. at 453, 816 P.2d at 1073.  As for the scope of our review, we do not resolve conflicts in the evidence, and we do not consider whether evidence supports findings that are different from those made by the WCC; rather, we confine our review to determining whether substantial credible evidence supports the findings actually made by the WCC.  *Kloepfer v. Lumbermen's Mut. Cas. Co.*, 276 Mont. 495, 498-99, 916 P.2d 1310, 1312 (1996); *Montana State Fund v. Murray*, 2005 MT 97, ¶ 19, 326 Mont. 516, ¶ 19, 111 P.3d 210, ¶ 19; *In re Abfalder*, ¶ 10.

¶12    The "substantial credible evidence" standard of review is further defined by rules regarding our consideration of witness testimony.  As for witnesses who testify in person at trial, we defer to the WCC's findings concerning credibility and the weight to be accorded to this testimony.  *Kuntz v. Nationwide Mut. Fire Ins. Co.*, 1998 MT 5, ¶ 35,

7

287 Mont. 142, ¶ 35, 952 P.2d 422, ¶ 35; *Wilson v. Liberty Mut. Fire Ins.*, 273 Mont. 313, 319, 903 P.2d 785, 787-88 (1995).  It is the WCC's job to resolve any inconsistencies in a witness's testimony.  *Walls v. Travelers Indem. Co.*, 281 Mont. 106, 111, 931 P.2d 712, 716 (1997).  Ultimately, because an assessment of testimony is best made upon observation of the witness's demeanor and consideration of other intangibles that are only evident during live testimony, we will not substitute our judgment for the WCC's judgment regarding credibility and the weight accorded to live witness testimony.  *Wilson*, 273 Mont. at 319, 903 P.2d at 787.

¶13    Conversely, we are in as good a position as the WCC to assess testimony presented at trial by way of deposition.  *McIntyre v. Glen Lake Irr. Dist.*, 249 Mont. 63, 67, 813 P.2d 451, 454 (1991); *White v. Ford, Bacon & Davis Texas, Inc.*, 256 Mont. 9, 13, 843 P.2d 787, 789 (1992).  Therefore, we conduct de novo review of deposition testimony.  *White*, 256 Mont. at 13, 843 P.2d at 789.  However, this independent review of deposition testimony is only one component of our task on appeal.  We must then consider the deposition testimony in the context of the other relevant evidence in order to properly assess the factual findings at issue.  *McIntyre*, 249 Mont. at 67-68, 813 P.2d at 454; *White*, 256 Mont. at 13, 843 P.2d at 789.  As we have stated, even where we conduct de novo review of deposition testimony, we are ultimately restricted to determining whether substantial credible evidence supports the WCC's findings.  *Weber v. Public Employees' Retirement Bd.*, 270 Mont. 239, 245, 890 P.2d 1296, 1299 (1995).

**DISCUSSION**

8

¶14     *Issue: Did the WCC err in concluding that Stillwater was responsible for payment of Harrison's medical costs and disability benefits?*

¶15     In resolving this issue we first address whether the WCC's factual findings were supported by substantial credible evidence. Our review of the record reveals that the WCC received testimony from Harrison and from two of Harrison's treating physicians. Harrison testified in person before the WCC judge as well as by deposition while Varnavus and Quenemoen provided testimony by deposition alone.

¶16     Stillwater does not expressly challenge any of the WCC's declared factual findings; however, it does challenge the conclusion of law set forth below, which contains factual elements. Therefore, we will review the factual component of this conclusion to determine if it is supported by substantial credible evidence.

¶17     Stillwater challenges the following legal conclusion:

> Varnavus is the only treating physician to offer an opinion as to whether [Harrison's] injury while working at Derek Brown arose from [Harrison's] earlier injury at Stillwater. Dr. Varnavus opined that it did. When Dr. Quenemoen was asked whether or not the Derek Brown injury was attributable to the earlier Stillwater injury, Dr. Quenemoen responded that he did not know. Therefore, the [c]ourt is left with the uncontroverted testimony of Dr. Varnavus.

¶18     Stillwater disputes the "uncontroverted" characterization of Varnavus's opinion that the injury Harrison experienced while working at Derek Brown was attributable to the earlier Stillwater injury. Stillwater maintains that because both Harrison and Quenemoen provided testimony that refuted Varnavus's opinion, the WCC's "conclusion" to the contrary is not supported by substantial credible evidence.

¶19 Liberty counters that the WCC justifiably gave greater weight to Varnavus's expert opinion testimony than it did to Harrison's recollection testimony. The insurer notes that Varnavus testified from written medical notes taken during Harrison's treatment whereas Harrison testified only from his own memory. Citing the Commission Comment to M. R. Evid. 803(4), Liberty opines that Harrison's description of his symptoms when he visited Varnavus was accurate because Harrison was motivated to obtain proper diagnosis and treatment; therefore, if Harrison's current testimony based on recollection conflicts with Varnavus's testimony based on written contemporaneous notes, Varnavus's testimony as to Harrison's complaints is entitled to the greater weight.

¶20 Additionally, Liberty argues that Quenemoen acknowledged that he was unfamiliar with the term used by Varnavus in diagnosing Harrison with "segmental instability." Liberty asserts that because Quenemoen could not properly diagnose Harrison's condition, Varnavus's testimony once again was properly given greater weight.

¶21 Lastly, Liberty argues that if Varnavus and Quenemoen presented conflicting testimony, it is the WCC's role to resolve such conflicts.

¶22 As indicated above, the WCC is responsible for resolving conflicting testimony and assigning the weight to be given to witness testimony. *Gamble*, ¶¶ 20-21. While Quenemoen's testimony conflicted with Varnavus's and may have supported different findings leading to different conclusions, the WCC accorded greater weight to Varnavus's testimony, as it was entitled to do. Our review of the record confirms that the WCC's factual findings, whether they are included in the fact-finding or the legal

conclusion section of the WCC's Order, are supported by substantial credible evidence; therefore we will not disturb its conclusions based on those findings. Lastly, we disagree with the court's characterization that Varnavus's testimony is "uncontroverted," but conclude that this erroneous description does not change the fact that there was substantial evidence to support the court's decision.

¶23 We next determine whether the WCC correctly applied the "causal" standard as opposed to the "aggravated" standard in determining Stillwater's liability. Stillwater maintains that the WCC erred in its determination that Harrison's Derek Brown injury arose from his earlier Stillwater injury, and argues that the Derek Brown injury was an intervening injury and a permanent aggravation of the Stillwater injury, relieving it of liability. Stillwater provides extensive legal authority for its position; however, its argument is irreconcilable with Varnavus's unequivocal testimony that Harrison's Stillwater injury and evolving degenerative spinal condition were the causes of the Derek Brown injury. In many of the cases upon which Stillwater relies, the WCC had to determine whether the second injury was a new "permanent aggravation" or a "recurrence of symptoms" of the initial occupational disease or injury. E.g., *Caekaert v. State Comp. Mut. Ins. Fund*, 268 Mont. 105, 885 P.2d 495 (1994); *Liberty N.W. Ins. v. Champion Intern.*, 285 Mont. 76, 945 P.2d 433 (1997). In *Caekaert*, we explained that "[a] later injury is compensable by the original carrier if it is a direct and natural result of a compensable primary injury and not the result of an independent intervening cause attributable to the claimant. . . . If the original injury or occupational disease was the cause of the current condition, the [original carrier] is liable." *Caekaert*, 268 Mont. at

11

112, 885 P.2d at 499. In making this determination, the court had to rely on the medical evidence presented, resolve any conflicting testimony and assign weight to the testimony. Again, in the case before us, the WCC did just that, and after weighing the evidence, concluded that Varnavus's testimony was credible and convincing. As determined above, because the record supports the court's findings, we will not disturb the court's conclusions.

¶24 Lastly, we determine whether the WCC erred in re-opening the parties' settlement agreement. As we explained in *Gamble*, a settlement agreement is a contract; therefore, we apply contract law to determine whether the agreement is valid and enforceable. *Gamble,* ¶ 24 (citation omitted). At the time of settlement, the WCC determined that Stillwater and Harrison did not believe Harrison's injury would require surgery and therefore the settlement terms did not include consideration of this possibility. As a result, the parties were operating under a material mistake of fact.

¶25 Stillwater's argument that the WCC's conclusion is incorrect is based on its continued assertion that Harrison's condition was aggravated by the Derek Brown injury rather than the Derek Brown injury stemming from the Stillwater injury. Having determined that the WCC's finding to the contrary is supported by the record, we analyze only whether the circumstances allowing for re-opening a settlement agreement are present here.

¶26 Again, as we stated in *Gamble*, a "material" fact is "a vital fact upon which [the parties] based their bargain," and a mutual mistake regarding a material fact is a mistake that is "so substantial and fundamental as to defeat the object of the parties in making the

12

contract." *Gamble*, ¶ 27. Additionally, we have determined previously that a settlement agreement must be re-opened if, when the parties entered into it, they were mutually mistaken regarding a fact that was material to the agreement. *Kienas v. Peterson*, 191 Mont. 325, 328-30, 624 P.2d 1, 2-3 (1980); *Weldele v. Medley Development*, 227 Mont. 257, 260, 738 P.2d 1281, 1283 (1987); *Kimes v. Charlies Fam. Din. & Donut Shop*, 233 Mont. 175, 177, 759 P.2d 986, 988 (1988); *Gamble*, ¶ 26. Moreover, we have determined that the nature and extent of a claimant's physical condition is a fact that is material to an agreement settling an injury claim. *Kienas*, 191 Mont. at 330, 624 P.2d at 3; *Weldele*, 227 Mont. at 261, 738 P.2d at 1283; *Kime*, 233 Mont. at 178, 759 P.2d at 988; *Gamble*, ¶ 27.

¶27 Here, prior to execution of the settlement agreement, Harrison had been diagnosed with early degenerative changes in his lumbar spine but had been told by both McDowell and Quenemoen that surgical intervention was not indicated at that time. The diagnoses and prognoses of both McDowell and Quenemoen are undisputed. Subsequently, a more comprehensive diagnosis was made, and it was medically determined that corrective surgery was in fact required. This fact, coupled with the WCC's conclusion that the operable condition stemmed from the earlier Stillwater injury, demonstrates that there was a material misunderstanding of the nature and extent of Harrison's condition at the time of the settlement. Therefore, we conclude that the court did not err in concluding that a re-opening of the settlement agreement was warranted.

## CONCLUSION

¶28    For the foregoing reasons, we affirm the WCC's Findings of Fact, Conclusions of Law and Judgment imposing liability for Harrison's medical costs and disability benefits on Stillwater.

/S/ PATRICIA COTTER

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ JIM RICE