No. DA 06-0172

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 131

MARY ANN GAMBLE,

Petitioner and Respondent,

v.

SEARS, the parent SEARS HOLDINGS
CORPORATION, subsidiaries and affiliates
KMART, the parent SEARS HOLDINGS
CORPORATION, subsidiaries and affiliates,

Respondent and Appellant.

APPEAL FROM:    Montana Workers' Compensation Court, WWC No. 2005-1337
                Honorable James J. Shea, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Michael P. Heringer, Don M. Hayes, Brown Law Firm, P.C.,
                Billings, Montana

        For Respondent:

                Mark M. Kovacich, Lewis, Slovak & Kovacich, P.C.,
                Great Falls, Montana

                                        Submitted on Briefs:  October 10, 2006

                                                Decided:  June 5, 2007

Filed:

        _____
                                Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Sears Holdings Corporation appeals from the judgment of the Workers' Compensation Court rescinding the settlement agreement in Mary Ann Gamble's injury claim.

¶2     The Appellant raises the following issues for review:

¶3     (1) Did the court err in rescinding the parties' settlement agreement?

¶4     (2) Did the court err in concluding that Gamble's failure to comply with § 39-71-1101(2), MCA, did not absolve Sears of liability for the cost of medical treatment?

¶5     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     K-Mart Corporation ("K-Mart") hired Mary Ann Gamble ("Gamble") in 1988 to work at its retail store in Great Falls, Montana. After working in several capacities at the store during the following years, Gamble was promoted to the position of manager of the housewares department in 1996. Thereafter, on May 16, 1997, she was injured in an accident that occurred during the course and scope of her employment.

¶7     As department manager, Gamble was required to lift and move pieces of furniture, appliances, and other items. Her injury occurred while she was moving a desk, weighing approximately 150 pounds, which was contained in a box. As she attempted to remove the box from a shelf, it fell onto the top of her head. She instantly experienced severe pain in her neck. Her left knee was also injured in this accident, eventually requiring

surgery, but only her neck injury is at issue in this appeal. Gamble reported her injuries to K-Mart's personnel department and filed an injury claim form that day.[1]

¶8    During the period in which K-Mart employed Gamble, it was self-insured for workers' compensation purposes. Thus, K-Mart accepted liability for Gamble's injury claim and paid benefits accordingly. Sears Holdings Corporation ("Sears") is the successor to K-Mart and has assumed liability for K-Mart's workers' compensation claims.

¶9    After the accident, Gamble experienced a number of symptoms including continuous pain in her neck, particularly at the base of her skull, a limited range of motion in her neck, severe headaches on a regular basis, as well as numbness and a burning sensation on the right side of her face. Additionally, the act of leaning forward—to pick up a piece of merchandise from the floor, for example—caused nausea and vomiting. The severity of Gamble's condition caused her to frequently cut short her work shifts at the store. Ultimately, her symptoms did not subside until September of 2004 after she underwent surgery to fuse a fractured bone in her neck.

¶10   Although Gamble visited a chiropractor shortly after the accident, she did not seek additional medical treatment for a number of months, as she hoped her neck would heal on its own. Then, in the fall of 1997, after Gamble missed part of a day of work due to a particularly severe headache which brought on an extended bout of nausea and vomiting, her manager expressed concern over her frequent absence from work and directed her to

---

[1]   The personnel department lost the original claim form and later directed Gamble to fill out another one. Consequently, the claim form in the record is dated January 19, 1998.

see a physician. Accordingly, in November of 1997, Gamble went to Dr. Jerry Speer, a board-certified family practitioner in Great Falls. Based on his examination, Dr. Speer believed Gamble was suffering from "a muscular rotational injury with underlying osteoarthritic problems." He prescribed anti-inflammatory medication and referred Gamble to Dr. Dale Schaefer, a board-certified neurosurgeon.

¶11    After examining Gamble in December of 1997, Dr. Schaefer initially believed that she was suffering from a soft-tissue injury. Thus, he recommended pain medication and a course of physical therapy. Gamble completed six weeks of physical therapy and reported that it did not relieve her symptoms. As an additional diagnostic measure, Dr. Schaefer then ordered a cervical myelogram and CAT scan. After reviewing the films from these tests, Dr. Schaefer came to believe that Gamble was suffering from arthritic degenerative or spondylitic changes in her neck, rather than a soft-tissue injury, and therefore concluded that he could not offer treatment that would benefit her. Consequently, he released Gamble from his care, and she continued to see Dr. Speer.

¶12    In March of 1998, Gamble ceased working at K-Mart due to her persisting symptoms. Then, in September of 1998, she was examined by a panel of doctors at the request of the firm administering Gamble's injury claim, Compensation Adjusters, Inc. In rendering its report, the panel diagnosed Gamble with, among other things, "multi-level cervical degenerative changes." While the panel determined that this condition likely existed before her on-the-job injury, it also determined that "the occupational injury represents a significant and permanent aggravation" of her pre-existing degenerative condition. Further, the panel determined that Gamble had

4

reached a maximum medical improvement plateau, but also noted that she could require further treatment. Finally, the panel assigned her a 5% whole-person impairment rating and determined that while continued work as the housewares department manager would be inappropriate, she "may be able to return to a light duty vocational position with restrictions."

¶13 In May of 2001, the parties entered into an agreement that settled Gamble's claims for disability and rehabilitation benefits under the Workers' Compensation Act. At that time, the parties believed that Gamble's condition had been properly diagnosed and that she had achieved maximum medical improvement, in accordance with the panel's conclusion. However, the settlement agreement expressly reserved further medical benefits, apparently because the panel had determined that Gamble could require further treatment. Yet, because Gamble was not diagnosed with a fracture at the time of settlement, the reservation of medical benefits did not extend to that condition. Shortly thereafter, the Department of Labor and Industry approved this settlement agreement.

¶14 In the years following the settlement of her claim, Gamble's symptoms did not subside. During this time, Dr. Speer periodically prescribed pain medication and muscle relaxant medication. He also conducted testing which demonstrated that Gamble was not suffering from rheumatoid arthritis. Gamble treated with Dr. Speer until he ceased his full-time family practice in 2003. Then, in the summer of 2004, Gamble went to Dr. James Legan, who ordered new MRI testing. Based on the results, Dr. Legan determined that she was suffering from a fracture in her odontoid process, which is a part of the second vertebra of the neck. He then referred Gamble to Dr. Michael Dube, a

board-certified orthopedic surgeon. Dr. Dube ordered a CAT scan in August of 2004. The results of that test clearly showed that Gamble was suffering from an odontoid fracture that had failed to heal properly. He recommended that Gamble undergo a bone fusion surgery without delay, and informed her of the serious risks associated with such a procedure. Gamble agreed to undergo the procedure and Dr. Dube successfully performed surgery in September of 2004. Consequently, Gamble's symptoms subsided dramatically.

¶15 Thereafter, Dr. Dube was presented with the results of an x-ray taken in March of 1998, less than a year after Gamble's injury occurred. Upon review, he concluded that Gamble's odontoid fracture was visible in these x-ray films. Dr. Dube further concluded, based on the eroded bone margins and callous formation he found at the site of the fracture, the 1998 x-ray films, and Gamble's symptoms, that her odontoid fracture was caused by the 1997 accident at K-Mart.

¶16 In June of 2005, Gamble filed a petition for trial with the Workers' Compensation Court ("WCC"). In the petition, Gamble contended that she had not reached maximum medical improvement when the settlement agreement was executed, contrary to the parties' belief, because her odontoid was fractured at that time. Thus, Gamble contended, both parties' consent to the settlement agreement was based on a mutual mistake regarding the nature of her physical condition. Additionally, Gamble asserted that Sears had acted unreasonably in refusing to recognize the mutual mistake and provide coverage for the medical expenses she incurred as a result of the fracture. Upon these contentions,

6

Gamble requested that the WCC rescind the settlement agreement and award attorney fees and a penalty against Sears for its unreasonable conduct.[2]

¶17    In response, Sears argued that no mutual mistake of fact had occurred and that the settlement agreement should not be rescinded.  Sears also argued that it was not liable for the cost of any treatment rendered by Dr. Legan or Dr. Dube, regardless of whether Gamble's odontoid fracture was caused by the 1997 accident, because she had failed to obtain authorization to treat with either of these doctors.

¶18    The WCC held a trial in January of 2006.  In rendering its judgment shortly after trial, the court found that Gamble's odontoid fracture was caused by the 1997 accident at K-Mart and that it was present when the parties entered into their settlement agreement in 2001.  Thus, because Sears and Gamble believed that she had been properly diagnosed and had reached maximum medical improvement at the time of settlement, the WCC found that the parties were mistaken regarding a fact that was material to the agreement. Accordingly, the WCC rescinded the settlement agreement, thereby reopening Gamble's claim.  Further, the WCC rejected Sears' argument that Gamble's failure to request authorization to change treating physicians absolved Sears of liability for the cost of treatment rendered by Dr. Legan and Dr. Dube.  In doing so, the court observed that no one knew Gamble's odontoid fracture was related to the 1997 accident until after Dr. Dube performed the bone fusion surgery.  Finally, the court denied Gamble's request for

---

[2]  Sections 39-71-611 and 39-71-2907, MCA, respectively provide for an award of attorney fees and the assessment of a penalty against an insurer that unreasonably denies liability or delays or refuses to make payments.

an award of attorney fees and a penalty, finding that Sears had not acted unreasonably in opposing her effort to reopen the claim.

¶19 Sears now appeals from the judgment.

## STANDARD OF REVIEW

¶20 We conduct de novo review of the WCC's conclusions of law in order to determine whether they are correct. *Flynn v. Uninsured Employers' Fund*, 2005 MT 269, ¶ 11, 329 Mont. 122, ¶ 11, 122 P.3d 1216, ¶ 11. As for the WCC's findings of fact, however, our review is both deferential and limited in scope. We simply review the WCC's factual findings to determine whether they are supported by substantial credible evidence. *In re Abfalder*, 2003 MT 180, ¶ 10, 316 Mont. 415, ¶ 10, 75 P.3d 1246, ¶ 10. We have stated that substantial credible evidence is that which a reasonable mind could accept as adequate to support a conclusion. *Simms v. State Compensation Ins. Fund*, 2005 MT 175, ¶ 11, 327 Mont. 511, ¶ 11, 116 P.3d 773, ¶ 11. Indicating the high level of deference this Court accords to the WCC's factual findings, we have stated that evidence will be considered substantial even if it is contradicted by other evidence, even if it is somewhat less than a preponderance, and even if it is inherently weak. *EBI/Orion Group v. State Compensation Mut. Ins. Fund*, 249 Mont. 449, 453, 816 P.2d 1070, 1073 (1991); *Simms*, ¶ 11; *Wolfe v. Webb*, 251 Mont. 217, 230, 824 P.2d 240, 248 (1992). However, it must be more than a mere "scintilla" of evidence and it must rise above the level of "trifling or frivolous." *Simms*, ¶ 11; *EBI/Orion Group*, 249 Mont. at 453, 816 P.2d at 1073. As for the scope of our review, we do not resolve conflicts in the evidence, and we do not consider whether evidence supports findings that are different than those made by

8

the WCC; rather, we confine our review to determining whether substantial credible evidence supports the findings actually made by the WCC. *Kloepfer v. Lumbermen's Mutual Casualty Co.*, 276 Mont. 495, 498-99, 916 P.2d 1310, 1312 (1996); *Montana State Fund v. Murray*, 2005 MT 97, ¶ 19, 326 Mont. 516, ¶ 19, 111 P.3d 210, ¶ 19; *In re Abfalder*, ¶ 10.

¶21 The "substantial credible evidence" standard of review is further defined by rules regarding our consideration of witness testimony. As for witnesses who testify in person at trial, we defer to the WCC's findings concerning credibility and the weight to be accorded to this testimony. *Kuntz v. Nationwide Mutual Fire Ins. Co.*, 1998 MT 5, ¶ 35, 287 Mont. 142, ¶ 35, 952 P.2d 422, ¶ 35; *Wilson v. Liberty Mutual Fire Ins.*, 273 Mont. 313, 319, 903 P.2d 785, 788 (1995). It is the WCC's job to resolve any inconsistencies in a witness's testimony. *Walls v. Travelers Indemnity Co.*, 281 Mont. 106, 111, 931 P.2d 712, 716 (1997). Ultimately, because an assessment of testimony is best made upon observation of the witness's demeanor and consideration of other intangibles that are only evident during live testimony, we will not substitute our judgment for the WCC's judgment regarding credibility and the weight accorded to live testimony. *Wilson*, 273 Mont. at 319, 903 P.2d at 788.

¶22 Conversely, we are in as good a position as the WCC to assess testimony presented at trial by way of deposition. *McIntyre v. Glen Lake Irrigation District*, 249 Mont. 63, 67, 813 P.2d 451, 454 (1991); *White v. Ford, Bacon & Davis Texas, Inc.*, 256 Mont. 9, 13, 843 P.2d 787, 789 (1992). Therefore, we conduct de novo review of deposition testimony. *White*, 256 Mont. at 13, 843 P.2d at 789. However, this

independent review of deposition testimony is only one component of our task on appeal. We must then consider the deposition testimony in the context of the other relevant evidence in order to properly assess the factual findings at issue. *McIntyre*, 249 Mont. at 67-68, 813 P.2d at 454; *White*, 256 Mont. at 13, 843 P.2d at 789. As we have stated, even where we conduct de novo review of deposition testimony, we are ultimately restricted to determining whether substantial credible evidence supports the WCC's findings. *Weber v. Public Employees' Retirement Board*, 270 Mont. 239, 245, 890 P.2d 1296, 1299 (1995).

## DISCUSSION

¶23 **(1) Did the court err in rescinding the parties' settlement agreement?**

¶24 A settlement agreement is a contract; therefore, we apply contract law to determine whether the agreement is valid and enforceable. *Wolfe*, 251 Mont. at 223, 824 P.2d at 244.

¶25 The parties must give their consent to enter into a contract. *Wolfe*, 251 Mont. at 227, 824 P.2d at 246 (citing § 28-2-102(2), MCA). The requisite consent must be given freely, and consent cannot be given freely when it is based on a mistake. *Wolfe*, 251 Mont. at 227, 824 P.2d at 246 (citing § 28-2-301(1) and § 28-2-401(1)(e), MCA). Either a mistake of fact or a mistake of law will preclude freely given consent.[3] *Wolfe*, 251 Mont. at 224, 824 P.2d at 244 (citing § 28-2-408, MCA). A mistake of fact, which

---

[3] We have addressed both scenarios in cases appealed from the WCC. *See*, e.g., *Kienas v. Peterson*, 191 Mont. 325, 330, 624 P.2d 1, 3 (1980) (addressing the parties' mutual mistake regarding facts relevant to the claimant's physical condition) and *Brown v. Richard A. Murphy, Inc.*, 261 Mont. 275, 282, 862 P.2d 406, 410 (1993) (addressing a mutual mistake regarding the law of subrogation rights).

10

Gamble alleges in this case, is defined as "a mistake not caused by the neglect of a legal duty on the part of the person making the mistake," and consisting of "an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract" or a belief in "the present existence of a thing material to the contract which does not exist" or a belief in "the past existence of such a thing which has not existed." *Wolfe*, 251 Mont. at 224, 824 P.2d at 244 (citing § 28-2-409, MCA).

¶26 Pursuant to these rules, it is well established that a settlement agreement must be rescinded if, when the parties entered into it, they were mutually mistaken regarding a fact that was material to the agreement.[4] *Kienas v. Peterson*, 191 Mont. 325, 328-30, 624 P.2d 1, 2-3 (1980); *Weldele v. Medley Development*, 227 Mont. 257, 260, 738 P.2d 1281, 1283 (1987); *Kimes v. Charlie's Family Dining*, 233 Mont. 175, 177, 759 P.2d 986, 988 (1988); *Wolfe*, 251 Mont. at 223-28, 824 P.2d at 244-46; *South v. Transportation Ins. Co.*, 275 Mont. 397, 401, 913 P.2d 233, 235 (1996).

---

[4] We recognize that it is not strictly accurate to say that the agreement must be "rescinded" based on a mutual mistake of material fact, because such a mistake technically precludes the formation of a contract, *Weldele*, 227 Mont. at 260, 738 P.2d at 1283, and rescission cannot technically occur unless a contract has first been formed, see *Black's Law Dictionary* 1332 (Bryan A. Garner ed., 8th ed., West 2004) (citations omitted). Nonetheless, our cases have often used the term "rescind" to describe the appropriate remedy where a mutual mistake occurs. *See*, e.g., *South*, 275 Mont. at 401, 913 P.2d at 235; *Brown*, 261 Mont. at 282, 862 P.2d at 411; *Whitcher v. Winter Hardware Co.*, 236 Mont. 289, 292, 769 P.2d 1215, 1216 (1989). This technical inconsistency is similar to that which is present in the commonly used expression "void contract." The so-called "void contract" is actually a contradiction in terms because a "contract" is defined in terms applicable only to a valid agreement; however, the phrase "void contract" is convenient and therefore used universally. *Black's Law Dictionary* at 350 (citations omitted). Similarly, in our workers' compensation cases, we continue to use the term "rescind" as a convenient means of characterizing the remedy that must follow where the parties' consent to an agreement was based on a mutual mistake of material fact.

¶27 A "material" fact is "a vital fact upon which [the parties] based their bargain." *South*, 275 Mont. at 401, 913 P.2d at 235 (internal quotation marks omitted). Thus, we have stated that a mutual mistake regarding a material fact is a mistake that is "so substantial and fundamental as to defeat the object of the parties in making the contract." *South*, 275 Mont. at 401, 913 P.2d at 235 (internal quotation marks omitted). Finally, we have determined in several cases that the nature and extent of a claimant's physical condition is a fact that is material to an agreement settling an injury claim.[5] *Kienas*, 191 Mont. at 330, 624 P.2d at 3; *Weldele*, 227 Mont. at 261, 738 P.2d at 1283; *Kimes*, 233 Mont. at 178, 759 P.2d at 988; *Wolfe*, 251 Mont. at 231, 824 P.2d at 248.

¶28 Here, Gamble had not been diagnosed with an odontoid fracture when she entered into the settlement agreement with K-Mart. It is undisputed that if Gamble's fracture existed at that time, the parties were mutually mistaken as to a material fact—i.e., the nature of her physical condition—and the agreement must therefore be rescinded.[6] Thus, in order to resolve the first issue raised in this appeal, we need only determine whether

---

[5] In addressing the contract law principles relevant to this case, Sears cites our unpublished decision in *Romans v. Liberty Mutual Fire Ins. Co*., 2001 MT 64N, despite the fact that we expressly designated it as a noncite opinion and stated in the very first paragraph of the decision that it "shall not be cited as precedent." Thus, we admonish Sears for disregarding our express instruction regarding the *Romans* decision.

[6] Although Sears does not dispute this application of the law, it nonetheless directs our attention to a portion of the settlement agreement which provides that Gamble's claim cannot be reopened even if the parties are mistaken as to the nature or extent of her physical condition. That provision states in part: "both the Insurer and Claimant agree to assume the risk that the condition of the Claimant, as indicated by reasonable investigation to date, may be other than it appears." However, this provision is of no consequence. In *Wolfe*, this Court held that such a provision is not enforceable because it directly conflicts with Montana law regarding the formation of a contract—i.e., freely given consent is a prerequisite, and consent cannot be freely given when it is based on a mistake. *Wolfe*, 251 Mont. at 227-28, 824 P.2d at 246. In other words, parties may not agree to enter into a legally invalid contract.

substantial credible evidence supports the WCC's finding that Gamble's odontoid fracture was caused by the 1997 accident at K-Mart and was present when the parties entered into their settlement agreement.

¶29 Before assessing the relevant evidence, however, we address three preliminary issues related to the standard of review. First, Sears challenges the credibility of Gamble's testimony regarding the mechanism of her injury and the onset of certain symptoms. Particularly, Sears argues that Gamble's testimony that the desk "fell" on her is inconsistent with her prior statements describing the incident as a "lifting" accident. Sears also argues that Gamble was inconsistent in her testimony regarding the burning sensation and numbness she experienced in her face. At trial, Gamble testified that she had continually experienced these symptoms since the accident, but also stated that she could not remember exactly when the symptoms began. Additionally, Sears emphasizes that Gamble did not report these particular symptoms to Dr. Schaefer even though the symptoms had allegedly been present since the accident.

¶30 The applicable standard of review in this case does not allow us to render our own judgment regarding the alleged inconsistencies that Sears identifies. As noted above, it is the WCC's job to resolve any inconsistencies in a witness's testimony, and this Court defers to the WCC's findings regarding the credibility of testimony rendered in person at trial. *Walls*, 281 Mont. at 111, 931 P.2d at 716; *Kuntz*, ¶ 35; *Wilson*, 273 Mont. at 319, 903 P.2d at 788. We have consistently adhered to this rule because an assessment of testimony is best made upon observation of the witness's demeanor and consideration of other intangibles that are only evident during live testimony. *See Wilson*, 273 Mont. at

319, 903 P.2d at 788. Here, because Gamble testified in person at trial, the WCC was able to observe her demeanor, consider any inconsistencies in her testimony, and ultimately judge her credibility based on these considerations and in light of the other evidence presented. The WCC did so and, as expressly stated in the written judgment, found that Gamble's testimony was credible.[7] Therefore, we consider Gamble's trial testimony to be credible. Further, we note that Gamble's husband testified in person at trial. He provided testimony that was consistent with Gamble's, and the WCC expressly found his testimony to be credible as well.

¶31 Second, Sears argues that substantial credible evidence supports a finding that Gamble's odontoid fracture was caused by a "natural progression of [her] underlying degenerative disk disease" rather than the 1997 accident. In supporting this argument, Sears presents a lengthy and detailed description of Gamble's medical history, which it characterizes as "overwhelming" evidence, and points to medical testimony which conflicts with the evidence that the WCC relied on in reaching its findings. In addition, Sears relentlessly emphasizes the fact that none of the doctors who examined her prior to settlement ever diagnosed an odontoid fracture. Of course, it goes without saying that Gamble was not diagnosed as having an odontoid fracture prior to settlement; if she had been, there would be no basis for this litigation. More importantly, however, our standard of review renders these arguments irrelevant.

---

[7] We note that even if some portion of a witness's testimony is shown to be false or unreliable, the WCC is not required to discount the entirety of that witness's testimony. *Walls*, 281 Mont. at 111, 931 P.2d at 716.

14

¶32 It is the WCC's job to make factual findings, while our limited appellate role is to merely review those findings. *Kloepfer*, 276 Mont. at 498-99, 916 P.2d at 1312. In conducting our review, we do not resolve evidentiary conflicts or consider whether evidence supports factual findings that the WCC did not make; rather, our inquiry is restricted to determining whether substantial credible evidence supports the findings *actually made* by the WCC. *Murray*, ¶ 19; *In re Abfalder*, ¶ 10; *Kloepfer*, 276 Mont. at 498-99, 916 P.2d at 1312. To that end, we simply review the evidence that the WCC relied on in making its findings, rather than conducting a far-reaching and comprehensive evidentiary analysis, as advocated by Sears, which would render our role no different than that of the WCC. Although we do conduct de novo review of testimony presented by way of deposition, that independent review function is only one element of our task on appeal, and it remains subordinate to the ultimate determination of whether substantial credible evidence supports the findings actually made by the WCC. *McIntyre*, 249 Mont. at 67-68, 813 P.2d at 454; *White*, 256 Mont. at 13, 843 P.2d at 789; *Weber*, 270 Mont. at 245, 890 P.2d at 1299. Therefore, we will not consider the merits of Sears' argument.

¶33 Third, Sears argues that we should make our own finding, entirely independent of the WCC's finding, as to whether Gamble's odontoid fracture existed at the time of settlement. In support of this argument, Sears argues that Gamble's physical condition at the time of settlement is simply a "medical question" which we can resolve de novo because all the medical testimony in this case was received in the form of transcribed depositions—evidence that we can review just as well as the WCC.

15

¶34 We have stated that "our review of medical evidence presented through depositions must be considered in the context of the other evidence presented at trial which was relevant to the medical issue." *Wilson*, 273 Mont. at 317, 903 P.2d at 787. Here, in addition to the medical testimony presented through depositions, Gamble's testimony given in person at trial was relevant to the issue of her physical condition at the time of settlement. Indeed, as explained below, her testimony was integral to the WCC's factual findings. Thus, because Gamble rendered pertinent testimony at trial regarding her physical condition, and because we do not conduct de novo review of testimony presented in person at trial, *Kuntz*, ¶ 35, we cannot make an independent factual finding as to whether Gamble's odontoid fracture existed at the time of settlement. Rather, we simply review the WCC's finding on this issue to determine whether it is supported by substantial credible evidence. *In re Abfalder*, ¶ 10.

¶35 We now turn to the evidence that the WCC relied on in making the critical finding of fact in this case—i.e., the finding that Gamble's odontoid fracture resulted from the 1997 accident at K-Mart and was present when the parties entered into their settlement agreement.

¶36 Dr. Dube testified that the 2004 CAT scan reveals Gamble was suffering from an "old fracture" which he characterized as a "nonunion" fracture because it had failed to heal properly. In support of this conclusion, Dr. Dube explained that the human body naturally produces new bone matter in attempting to heal a fracture. He further stated that the 2004 CAT scan results show evidence of "old attempts at healing where the bone margins were very eroded," as well as "callous formation" at the site of the fracture. This

16

analysis was confirmed by a set of x-ray films taken in March of 1998, less than one year after Gamble's injury occurred. Upon reviewing these films, Dr. Dube testified that they show a lucency in Gamble's odontoid which demonstrates the presence of a fracture in the same location as shown in the 2004 CAT scan.

¶37 While defense counsel emphasized that the 1998 x-ray films were not interpreted as showing an odontoid fracture at the time they were taken, Dr. Dube testified that such fractures often go undetected in the reasonable interpretation of radiology studies. While defense counsel also emphasized that a 1998 CAT scan of Gamble's neck was not interpreted at that time as showing an odontoid fracture, Dr. Dube testified that the CAT scan technology of 1998 was substantially inferior to present-day technology, and it did not allow for easy detection of an odontoid fracture. Further, while defense counsel deemed it significant that Gamble continued to work for some time after her 1997 accident, Dr. Dube testified that a fractured odontoid often does not prevent a person from engaging in normal activity for some time.

¶38 Dr. Dube also testified that odontoid fractures do not occur in the absence of trauma, and that the kind of trauma Gamble experienced in her 1997 accident at K-Mart is consistent with her fracture. Further, Dr. Dube testified that the symptoms Gamble experienced after her accident, particularly the pain at the base of her skull, are consistent with the presence of an odontoid fracture. Ultimately, Dr. Dube opined that Gamble's odontoid fracture was caused by her accident at K-Mart in 1997.

¶39 The testimony of Dr. George Ro, a board-certified radiologist, was consistent with that of Dr. Dube. Dr. Ro reviewed the 2004 CAT scan results and testified that they

show a "chronic" (i.e., aged or long term) fracture that had occurred "in the past remotely." Additionally, he reviewed the 1998 x-ray films and testified that they show a nonunion fracture as demonstrated by a lucency in Gamble's odontoid. Further, Dr. Ro testified that the lucency present in the 1998 x-ray films was consistent with the fracture that was evident in the 2004 CAT scan results. Finally, Dr. Ro testified that fractures may be overlooked in the reasonable interpretation of imaging studies.

¶40 Sears claims that the testimony of Dr. Dube and Dr. Ro is not credible and argues that we should therefore reverse the WCC because it "relied exclusively upon the deposition testimony of Drs. Ro and Dube" in rendering its findings. First, we note that the WCC did not rely exclusively on the testimony of these two doctors. In fact, the court also relied extensively on Gamble's testimony. Specifically, the WCC relied on Gamble's description of how the accident occurred, which was evidence of substantial trauma consistent with an odontoid fracture. The court also relied on Gamble's description of the symptoms she experienced after the accident—symptoms that are consistent with an odontoid fracture. Further, the court relied on Gamble's testimony that she had been tested for rheumatoid arthritis and the test showed that she does not have that condition. The actual test results were not available in this litigation. Thus, the court's reliance on Gamble's testimony was significant because the absence of rheumatoid arthritis ruled out the possibility, advocated by Sears, that her odontoid fracture was caused by that disease after the parties entered into their settlement agreement. Finally, the WCC relied on Gamble's testimony that she had not experienced any trauma to her neck since the accident, such as falling or being struck in the head,

which ruled out the possibility that a traumatic force could have caused her odontoid fracture after the settlement.

¶41 Sears argues that the testimony of Dr. Dube and Dr. Ro should be disregarded because it is based in part on the 1998 x-ray films which are inferior to MRI and CAT scan studies of Gamble's neck which were completed prior to settlement and were not interpreted by other physicians as showing an odontoid fracture. However, except for the 1998 x-ray films, the results of all pre-2004 radiographic studies of Gamble's neck were destroyed before this litigation ensued, for reasons not made clear in the record, and were therefore not available for review. Thus, we cannot fault Dr. Dube and Dr. Ro for relying in part on the 1998 x-ray films, despite the fact that these films are inferior to the MRI and CAT scan studies.

¶42 Sears also argues that Dr. Dube's testimony should be disregarded because it is based in part on Gamble's testimony which Sears claims is not credible. We reject this argument because, as noted above, the WCC expressly found Gamble's testimony to be credible and we must defer to the court's judgment in that regard.

¶43 As noted above, while our overall review of the WCC's factual findings is deferential and limited in scope, we conduct de novo review of deposition testimony because we are in as good a position as the WCC to evaluate such evidence. *White*, 256 Mont. at 13, 843 P.2d at 789. Here, Dr. Dube's testimony and Dr. Ro's testimony were received at trial in the form of transcribed depositions. Their testimony regarding Gamble's condition prior to settlement, and particularly their assessment of the 1998 x-ray films, conflicted with medical testimony offered by Sears. However, the WCC

found the testimony of Dr. Dube and Dr. Ro to be credible and therefore accorded it substantial weight. Having conducted de novo review of these two depositions, and having paid particular attention to defense counsel's extensive questioning of these physicians, we agree with the WCC's assessment.

¶44 Viewed in light of our highly deferential standard of review, the evidence relied on by the WCC is clearly sufficient to support the critical finding of fact in this case. The evidence establishes that Gamble's injury was consistent with her on-the-job accident, and that her symptoms were in turn consistent with the injury. Additionally, the evidence provides a basis for ruling out other potential causes of injury, which we have previously indicated is an important factor in determining whether the evidence is sufficient to support a WCC decision to rescind a settlement agreement for a mutual mistake of material fact. *Wolfe*, 251 Mont. at 231, 824 P.2d at 248 (where the WCC rescinded the settlement agreement based on the claimant's shoulder injury that was not diagnosed at the time of settlement, we identified claimant's testimony that he had sustained no trauma to his shoulder after the industrial accident as an important element of the evidence deemed sufficient to support the WCC's decision). Further, the evidence provides an explanation as to why Gamble's injury was not diagnosed until 2004, which we have indicated is another important factor. *Weldele*, 227 Mont. at 261, 738 P.2d at 1283 (where the WCC rescinded a settlement agreement because the claimant's thoracic outlet syndrome was undiagnosed at the time of settlement, our decision to affirm the WCC was based in part on medical testimony that this condition is difficult to diagnose).

¶45 The evidence relied on by the WCC certainly rises above the level of "trifling or frivolous," it constitutes far more than a mere "scintilla" of evidence, and we conclude that a reasonable mind could accept it as adequate to support the finding that Gamble's odontoid was fractured in the 1997 accident at K-Mart. *See Simms*, ¶ 11; *EBI/Orion Group*, 249 Mont. at 453, 816 P.2d at 1073. It is irrelevant that contradictory evidence presented by Sears may adequately support a different finding—it is not our role to resolve conflicts in the evidence or to determine whether the evidence would support findings contrary to those made by the WCC. *Murray*, ¶ 19; *Kloepfer*, 276 Mont. at 498-99, 916 P.2d at 1312. Thus, we hold that substantial credible evidence supports the WCC's finding that Gamble's odontoid fracture was caused by the 1997 accident at K-Mart and was present when the parties entered into their settlement agreement.

¶46 Because Sears does not dispute the WCC's application of the law, the remainder of our analysis is straightforward. It is undisputed that the parties mutually believed Gamble had reached maximum medical improvement at the time of settlement, and that this belief was "a vital fact upon which they based their bargain." *South*, 275 Mont. at 401, 913 P.2d at 235 (internal quotation marks omitted). It is also undisputed that if Gamble's odontoid fracture existed at the time of settlement, she had not reached maximum medical improvement, and the parties' mistaken belief regarding her physical condition was "so substantial and fundamental as to defeat the object of the parties in making the contract." *South*, 275 Mont. at 401, 913 P.2d at 235 (internal quotation marks omitted). Consequently, it is undisputed that if Gamble's odontoid fracture existed at the

21

time of settlement, the parties were mutually mistaken regarding a material fact, and the settlement agreement must therefore be rescinded.

¶47 Accordingly, because we have affirmed the WCC's finding that Gamble's odontoid fracture existed when the parties reached their settlement, we hold that the WCC did not err in rescinding the settlement agreement.

¶48 **(2) Did the court err in concluding that Gamble's failure to comply with § 39-71-1101(2), MCA, did not absolve Sears of liability for the cost of medical treatment?**

¶49 Section 39-71-1101(1), MCA, provides that a worker may choose his or her initial treating physician. Section 39-71-1101(2), MCA, provides:

> Authorization by the insurer is required to change treating physicians. If authorization is not granted, the insurer shall direct the worker to a managed care organization, if any, or to a medical service provider who qualifies as a treating physician, who shall then serve as the worker's treating physician.

Here, Gamble initially chose Dr. Speer as her treating physician. While he referred Gamble to Dr. Schaefer for treatment of her neck at one point, Dr. Speer remained Gamble's treating physician even after the parties entered into their settlement agreement which expressly reserved medical benefits. However, Dr. Speer ceased his medical practice in 2003. Gamble then went to Dr. Legan who conducted an examination and, based upon his findings, referred her to Dr. Dube who subsequently performed the bone fusion surgery.

¶50 Sears attempts to avoid liability for the extant costs of treating Gamble's odontoid fracture even if that injury is properly found to have been caused by her accident at K-Mart. Specifically, Sears argues that it was automatically absolved of all liability for

22

the cost of treatment rendered by Dr. Legan and Dr. Dube because Gamble obtained this treatment without first securing Sears' authorization to change treating physicians, thereby failing to comply with § 39-71-1101(2), MCA. In its judgment, the WCC ruled that Sears was not absolved of liability based on Gamble's failure to comply with the authorization rule of § 39-71-1101(2), MCA. This ruling is a conclusion of law which we review de novo. *Flynn*, ¶ 11.

¶51 While § 39-71-1101(2), MCA, states that "[a]uthorization by the insurer is required to change treating physicians," it does not contain a penalty provision, nor does Sears point to any statutorily established penalty that would be applicable where a claimant fails to comply with this statute. Further, § 39-71-1101(2), MCA, was enacted in 1993 and we have not had occasion to interpret it. However, we did interpret the authorization rule now set forth in this statute when it was previously contained in Montana's administrative rules. Sears relies on two such cases.

¶52 First, Sears relies on *Garland v. Anaconda Co.*, 177 Mont. 240, 581 P.2d 431 (1978). The claimant in that case, Douglas Garland, suffered a back injury in the course and scope of his employment, and it rendered him unable to continue working for a period of time. *Garland*, 177 Mont. at 241, 581 P.2d at 431-32. In the subsequent weeks, Garland was treated several times by a chiropractor who eventually determined, seventeen days after his injury occurred, that Garland could return to work at that time. *Garland*, 177 Mont. at 241, 581 P.2d at 432. Shortly after the chiropractor made this determination, Garland went to an orthopedist who provided treatment and advised him not to return to work for several more weeks. *Garland*, 177 Mont. at 242, 581 P.2d at

23

432. At that time, § 24-3.18 (22)-S18080 of the Montana Administrative Code required, as is required presently by § 39-71-1101(2), MCA, that a claimant must obtain authorization to choose a new treating physician over the one initially selected. *Garland*, 177 Mont. at 242-43, 581 P.2d at 432.

¶53 Garland's employer paid benefits for the seventeen-day period between his injury and the date on which the chiropractor determined that Garland could return to work. *Garland*, 177 Mont. at 241-42, 581 P.2d at 432. However, because Garland had not obtained authorization to treat with the orthopedist, his employer refused to pay benefits for the subsequent time period in which the orthopedist had advised Garland not to work. *Garland*, 177 Mont. at 242, 581 P.2d at 432. Consequently, Garland filed a petition in the WCC to obtain benefits. *Garland*, 177 Mont. at 242, 581 P.2d at 432. The WCC ruled that the employer had properly denied benefits based simply on Garland's failure to comply with the administrative rule requiring authorization to treat with the second doctor. *Garland*, 177 Mont. at 244, 581 P.2d at 433. On appeal, we recognized that a failure to comply with the authorization rule could result in a loss of coverage for treatment rendered by the unauthorized doctor, but we nonetheless held that the WCC had erred. *Garland*, 177 Mont. at 244, 581 P.2d at 433. Specifically, we held that the WCC should have considered the medical reports and diagnosis rendered by the second doctor rather than simply treating Garland's failure to comply with the authorization rule as a categorical bar to coverage. *Garland*, 177 Mont. at 244, 581 P.2d at 433. Accordingly, we vacated the WCC's judgment and remanded for consideration of the orthopedist's findings. *Garland*, 177 Mont. at 244, 581 P.2d at 433.

¶54     Second, Sears relies on *Carroll v. Wells Fargo Armored Service Corp.*, 240 Mont. 151, 783 P.2d 387 (1989).  The claimant in that case, Laine Carroll, suffered a back injury in the course and scope of his employment, for which the insurer accepted liability.  *Carroll*, 240 Mont. at 153, 783 P.2d at 389.  After treating for more than a year with the physician he had initially chosen, Carroll requested the insurer's authorization to go to another doctor; however, the insurer specifically refused to grant the authorization.  *Carroll*, 240 Mont. at 156, 783 P.2d at 390; Appellant's Brief at 19-20.  Nonetheless, Carroll went to the very doctor which the insurer had refused to authorize.  *Carroll*, 240 Mont. at 156, 783 P.2d at 390; Appellant's Brief at 19-20.  The insurer refused to pay the costs of treatment rendered by the second doctor because it had denied Carroll the authorization to change treating physicians, and because Carroll's initial treating physician had not referred him to this second doctor.  *Carroll*, 240 Mont. at 156, 783 P.2d at 390.  The WCC concluded that the insurer was not liable for the costs of treatment rendered by the second doctor based on Carroll's violation of the authorization rule.  *Carroll*, 240 Mont. at 156, 783 P.2d at 390; Appellant's Brief at 19.  In affirming, this Court cited *Garland* which, as noted above, recognized that a failure to obtain authorization to change treating physicians could in some cases result in a loss of coverage for treatment rendered by the unauthorized doctor.  *Carroll*, 240 Mont. at 156, 783 P.2d at 390.

¶55     Here, in seeking to avoid liability for the cost of treatment provided by Dr. Legan and Dr. Dube, Sears argues that *Garland* and *Carroll* establish an unqualified rule that a claimant's failure to obtain authorization to change treating physicians absolves the

25

insurer of all liability for the cost of treatment rendered by the unauthorized physician. However, *Garland* rejects the categorical imposition of such a severe penalty for failure to comply with the authorization rule. Indeed, we concluded that the WCC erred in *Garland* by treating a violation of the authorization rule as an absolute bar to coverage for treatment rendered by an unauthorized physician. *Garland*, 177 Mont. at 244, 581 P.2d at 433.

¶56 This Court also refused to treat a violation of the authorization rule as a categorical bar to coverage in *Hutchison v. General Host Corp.*, 178 Mont. 81, 582 P.2d 1203 (1978). The injured worker in that case, Betty Hutchison, received treatment from a number of doctors without obtaining the insurer's authorization to change treating physicians. *Hutchison*, 178 Mont. at 91-92, 582 P.2d at 1209. Consequently, the insurer argued that it was absolved of liability based on Hutchison's failure to comply with the authorization rule. *Hutchison*, 178 Mont. at 91-92, 582 P.2d at 1209. As we had done in *Garland*, we again rejected the categorical imposition of such a severe penalty for failure to comply with the authorization rule, noting that the rule must not be applied so as to defeat the general purpose of the Workers' Compensation Act. *Hutchison*, 178 Mont. at 92-93, 582 P.2d at 1209. Ultimately, because the insurer had refused to pay any benefits from the outset, we held the WCC correctly determined that Hutchison's failure to comply with the authorization rule did not absolve the insurer of liability for treatment rendered by unauthorized physicians. *Hutchison*, 178 Mont. at 92-93, 582 P.2d at 1209.

¶57 Consistent with *Garland* and *Hutchison*, we again refused to hold that a violation of the authorization rule categorically bars coverage in *Linton v. City of Great Falls*, 230

26

Mont. 122, 749 P.2d 55 (1988). The claimant in that case, Richard Linton, suffered an injury in the course and scope of his employment, for which the insurer accepted liability. *Linton*, 230 Mont. at 125, 749 P.2d at 57. After Linton received treatment from one physician initially, he obtained the insurer's authorization to treat with another physician. *Linton*, 230 Mont. at 125, 749 P.2d at 57. Subsequently, Linton went to yet another physician, Dr. Bill Tacke, without obtaining the insurer's authorization to do so. *Linton*, 230 Mont. at 126, 131, 749 P.2d at 58, 61. Dr. Tacke recommended that Linton undergo a course of physical rehabilitation treatment intended to manage chronic pain. *Linton*, 230 Mont. at 126, 749 P.2d at 58. Despite Linton's failure to obtain authorization to treat with another physician, the WCC ruled that the insurer was liable for the cost of the rehabilitation treatment Dr. Tacke had recommended. *Linton*, 230 Mont. at 126, 749 P.2d at 58. On appeal, the insurer did not dispute that the rehabilitation treatment was appropriate for Linton's condition, but argued that it could not be held liable for the cost of this treatment because Linton had not obtained authorization to treat with Dr. Tacke. *Linton*, 230 Mont. at 131, 749 P.2d at 61. In rejecting this argument and affirming the WCC's decision, we noted that the court had, in accordance with *Garland*, considered the actual diagnosis of Linton's condition in considering his failure to comply with the authorization rule. *Linton*, 230 Mont. at 132, 749 P.2d at 61. Ultimately, because the WCC had determined that the treatment recommended by Dr. Tacke was appropriate in light of Linton's condition, we held that the WCC had not erred in concluding that the insurer could not avoid liability based on Linton's failure to comply with the authorization rule. *Linton*, 230 Mont. at 132, 749 P.2d at 61-62.

¶58    As *Garland*, *Hutchison*, and *Linton* demonstrate, a claimant's failure to comply with the authorization rule does not necessarily absolve the insurer of liability for the cost of treatment rendered by an unauthorized physician. Although we held that the claimant in *Carroll* was properly denied coverage for the cost of treatment from an unauthorized doctor, our decision in that case did not establish that the same penalty must be imposed whenever a claimant fails to comply with the authorization rule. As noted above, the insurer in *Carroll* specifically refused the claimant's request for authorization to treat with a particular physician, but the claimant nonetheless obtained treatment from that very physician. This circumstance distinguishes the *Carroll* case from *Garland*, *Hutchison*, *Linton*, and the instant case.

¶59    Moreover, to categorically impose the penalty advocated by Sears, without regard to the facts of each case, would directly conflict with Montana's public policy underlying the Workers' Compensation Act. Viewing the statutory authorization rule in isolation, one might perhaps conclude that the failure to obtain authorization to change treating physicians should necessarily result in a loss of coverage for the treatment provided by the unauthorized physician. However, we cannot view § 39-71-1101(2), MCA, in isolation. As we have often held, in interpreting a statute we must view it as a part of a whole statutory scheme and construe it so as to forward the purpose of that scheme. *Orr v. State*, 2004 MT 354, ¶ 25, 324 Mont. 391, ¶ 25, 106 P.3d 100, ¶ 25. Further, we have held that statutes must be construed in a way that avoids absurd results. *Orr*, ¶ 25. Consistent with these longstanding principles, we stated in *Hutchison* that the authorization rule must not be applied in a way that would defeat the general purpose of

the Workers' Compensation Act. *Hutchison*, 178 Mont. at 92, 582 P.2d at 1209. Section 39-71-105(1), MCA, which the Legislature has entitled the "[d]eclaration of public policy" underlying the Workers' Compensation Act, states: "An objective of the Montana workers' compensation system is to provide, without regard to fault, wage-loss and medical benefits to a worker suffering from a work-related injury or disease." Given this underlying policy, we must reject Sears' contention that any failure to comply with the authorization rule necessarily eliminates medical benefits that are mandated under the Workers' Compensation Act. Categorical imposition of the penalty advocated by Sears, based solely on a mere failure to obtain authorization, could lead to absurd outcomes wherein an injured worker is deprived of all coverage for the cost of medical treatment that is undisputedly necessary to address an injury which was plainly sustained in the course and scope of employment. Such a draconian consequence is not only unjust on its face, it also directly conflicts with the Workers' Compensation Act's underlying purpose of ensuring medical benefits for work-related injuries without regard to fault. Simply put, the procedural authorization rule of § 39-71-1101(2), MCA, allows the insurer an opportunity to choose a treating physician if the claimant no longer prefers the doctor he or she initially chose; it does not operate as an escape mechanism by which the insurer can avoid all liability for the cost of undisputedly necessary treatment arising from a work-related injury.

¶60 As for Gamble's failure to obtain authorization of Dr. Legan as her treating physician, we note Sears does not dispute that the services rendered by Dr. Legan were appropriate for the treatment of Gamble's condition. Nor does Sears identify any specific

factual aspects of this case, other than Gamble's failure to obtain authorization of Dr. Legan, that would justify eliminating her coverage for medical treatment that was undisputedly appropriate. Rather, Sears simply argues that it was automatically absolved of all liability for the cost of Dr. Legan's treatment solely because Gamble failed to comply with § 39-71-1101(2), MCA. As demonstrated by *Garland*, *Hutchison*, and *Linton*, which accurately reflect the Workers' Compensation Act's underlying purpose, the law does not categorically deprive an injured worker of medical benefits based simply on a failure to comply with the procedural authorization rule.[8] Thus, because Sears simply argues for the categorical approach which this Court has repeatedly refused to employ, we hold that the WCC correctly concluded Sears was not absolved of liability for the cost of Dr. Legan's treatment.

¶61 As for Gamble's failure to obtain authorization of Dr. Dube as her treating physician, additional facts are relevant, but the outcome is the same. Sears does not dispute that the services rendered by Dr. Dube were appropriate for the treatment of

---

[8] We note that § 39-71-1101(2), MCA, appears to address the scenario where a claimant seeks to stop treating with his or her initially-chosen physician in order to obtain care from another physician. On its face, this statute does not require a claimant to obtain authorization to choose a treating physician where the claimant's initially-chosen physician has ceased practicing or otherwise become inaccessible. Here, when Dr. Speer ended his full-time practice, Gamble was left without her initially-chosen physician. As a result, she was not in a position to "change treating physicians" by choosing another physician over Dr. Speer; rather, Gamble had to select a doctor in the same way that she had done at the outset when she similarly had no treating physician. Thus, it would appear that Gamble did not attempt to "change treating physicians" as contemplated by § 39-71-1101(2), MCA. Indeed, the WCC assumed that Dr. Legan became Gamble's treating physician when she chose to treat with him after Dr. Speer ended his practice. Judgment, ¶ 22. However, because the parties have not squarely raised the issue on appeal, our Opinion here is not a comment on the issue of whether a claimant is actually bound to obtain the authorization required by § 39-71-1101(2), MCA, where the claimant's initially-chosen treating physician ceases to treat patients or otherwise becomes inaccessible.

Gamble's condition. Rather, Sears again simply argues that it was automatically absolved of all liability for the cost of Dr. Dube's treatment solely because Gamble failed to comply with the procedural authorization requirement of § 39-71-1101(2), MCA. We disagree.

¶62 At the time of settlement, neither of the parties believed Gamble was suffering from an odontoid fracture. Thus, although the settlement agreement expressly reserved medical benefits, it did not contemplate continuing medical benefits for the treatment of a fracture. Subsequently, after Dr. Legan detected Gamble's odontoid fracture, she went to Dr. Dube specifically for treatment of that newly discovered condition. Then, after Dr. Dube performed the bone fusion surgery, he reviewed the 1998 x-ray films and consequently determined that Gamble's odontoid fracture was caused by her on-the-job accident in 1997. In light of these circumstances, the proper resolution of this issue becomes abundantly clear.

¶63 If Gamble had sought authorization to treat with Dr. Dube, she would have been asking Sears to pay for treatment of a condition that was not yet determined to be causally connected to her on-the-job accident. While Sears faults Gamble for not doing so, it is undisputed, as the WCC noted, that if she had sought authorization, Sears itself would not have followed the mandates of § 39-71-1101(2), MCA—i.e., the insurer's obligation to either authorize the claimant's preferred physician or direct the claimant to another care provider for treatment of a work-related injury—precisely because her injury was not yet causally connected to the 1997 accident at K-Mart. Moreover, it is undisputed that even if Dr. Dube had opined prior to Gamble's surgery that her fracture

31

was caused by the 1997 accident, Sears would have refused authorization and disputed Dr. Dube's opinion, just as it has done throughout this litigation.

¶64 Because Gamble went to Dr. Dube for treatment of a condition that was unknown to the parties at settlement and therefore not contemplated by the settlement agreement's reservation of medical benefits, and because that condition was not causally connected to Gamble's on-the-job accident until after her surgery, we conclude that her failure to comply with § 39-71-1101(2), MCA, must be excused as a matter of law. To eliminate her benefits in these circumstances would directly conflict with the underlying purpose of the Workers' Compensation Act, and we have stated that the authorization rule must not be applied in such a way. *Hutchison*, 178 Mont. at 92, 582 P.2d at 1209. Thus, we hold that the WCC correctly concluded Sears was not absolved of liability for the cost of Dr. Dube's treatment.

## CONCLUSION

¶65 We have held that the WCC did not err in rescinding the settlement agreement or in holding Sears liable for the cost of Gamble's medical treatment.

¶66 Accordingly, we affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ BRIAN MORRIS